**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **MELISSA A. STEAGALL,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No: 3:06-CV-1010-P** |
| | ) | **ECF** |
| **COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY** | ) | |
| **Defendant,** | ) | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

This is an action for judicial review, pursuant to 42 U.S.C. § 405(g), of the final decision of

the Defendant Commissioner of Social Security ("Commissioner"), finding that Melissa Steagall

("Plaintiff") has experienced medical improvement related to her ability to work, and is no longer

disabled and is not entitled to adult Child's Insurance Benefits on the earnings record of her

deceased father under Title II.   *See* 42 U.S.C. §§ 402(d)(1) (Child's Insurance Benefits);

423(d)(1)(A) (Title II disability); 423(f) (cessation).   Plaintiff also appeals the Commissioner's

decision that she is not disabled and not eligible for Supplemental Security Income ("SSI")

payments under Title XVI of the Social Security Act ("Act").   *See* 42 U.S.C. § 1382c(a)(3)(A)

("Title XVI").

**FINDINGS AND CONCLUSIONS**

**Issue Presented**

The issue is whether substantial evidence supports the Commissioner's decision that Plaintiff

has experienced medical improvement related to her ability to work to the extent that her entitlement

to adult Child's Insurance Benefits under Title II has ceased and that she is not entitled to SSI

payments under Title XVI of the Act.   Plaintiff identifies the following specific issues:

1.        Whether the transcript record is sufficiently complete to determine "medical

improvement" in Plaintiff's condition and if not, whether Plaintiff was prejudiced;

2.      Whether the Commissioner properly evaluated the medical "Listings" for
        presumptive disability;

3.      Whether the Commissioner properly considered the vocational significance of all of
        Plaintiff's nonexertional impairments;

4.      Whether the Commissioner properly considered the opinions of treating and
        examining physicians in determining Plaintiff's residual functional capacity
        ("RFC"); and

5.      Whether the Commissioner properly evaluated Plaintiff's credibility.

(Pl.'s Br. at 7, 11-12, 14, and 17.)

The relevant requirements for entitlement to adult Child's Insurance Benefits[1] on the

earnings record of an insured individual state that the claimant be (1) the insured person's child, (2)

file an application, (3) be unmarried, and (4) if 18 years old or older have a disability that began

before age 22. *See* 20 C.F.R. §§ 404.350(a)(1)-(5); 404.352(b)(2)(2006); *Walton v. Halter*, 243 F.3d

703, 705 (3rd Cir. 2001).

## STATEMENT OF THE CASE

### Age, Education, and Work Experience

Plaintiff was born September 4, 1973, and has a history of special education through high

school and some remedial college courses. (Tr. 115, 976, 998, 1000.) For social security purposes,

Plaintiff has been defined as a younger individual at all times. (Tr. 487.) *See* 20 C.F.R. §§

404.1563(c), 416.963(c) (individual claimant under age 50 considered to be a younger person).

---

[1]   The Commissioner points out that an application for adult Child's Insurance Benefits
is different from an application for SSI childhood benefits under Title XVI of the Act. *See* 42
U.S.C. § 1382c(a)(3)(C); 20 C.F.R. § 416.926a.

Plaintiff unsuccessfully attempted to work at two different jobs.  She was fired from the first job because she failed to follow safety instructions and was fired from the second job because she could not meet her quotas.  Plaintiff did not hold the jobs long enough for them to be considered other work.  (Tr. 985.)  The Commissioner thus determined that Plaintiff has no relevant work history.  (Tr. 42.)

**<u>Procedural History</u>**

On December 16, 1992, Plaintiff filed an application for adult Child's Insurance Benefits on her deceased father's earnings record under Title II of the Act.  (Tr. 486-88.)  *See* 42 U.S.C. §§ 402(d)(1), 423(d)(1)(A).  The Commissioner found that Plaintiff was disabled as of December 23, 1992, because her impairments at the time prevented her from performing work existing in significant numbers in the economy.  (Tr. 30, 502.)

A continuing disability review of Plaintiff's case was completed in 1999, and the reviewer determined that Plaintiff's disability ceased effective July 1, 1999.  (Tr. 30, 496-506.)  *See* 42 U.S.C. § 423(f).  The cessation was affirmed on reconsideration and in an Administrative Law Judge ("ALJ") decision dated January 9, 2001.  (Tr. 30, 525-52.)  On May 23, 2002, the Appeals Council accepted jurisdiction and remanded the case to the ALJ for further proceedings.  (Tr. 30.)  On March 8, 2001, Plaintiff filed a separate application for SSI payments under Title XVI of the Act.  (Tr. 114-16.)  *See* 42 U.S.C. § 1382c(a)(3)(A).  After initial and reconsideration denials, Plaintiff requested a hearing before an ALJ.  (Tr. 30, 46-47, 61-72.)  After a hearing, an ALJ considered Plaintiff's remanded adult Child's Insurance benefits case and her new SSI application together and issued unfavorable decisions in both cases on September 26, 2002.  (Tr. 51-58, 957-93.)  On December 11, 2003, the Appeals Council again accepted jurisdiction and remanded the cases for further

3

proceedings, this time before a different ALJ.  (Tr. 92-97.)

On February 22, 2005, ALJ Ward D. King conducted a hearing on both cases in Ft. Worth, Texas.  (Tr. 994-1014.)  The witnesses who testified were Plaintiff, Ms. Dobi Durham (Plaintiff's sister), and Mr. Todd Harden, a Vocational Expert ("VE").  (Tr. 995-1014.)  On May 24, 2005, the ALJ issued an unfavorable decision finding that Plaintiff was no longer disabled effective July 1, 1999, and therefore, was not entitled to adult Child's Insurance Benefits and not eligible for SSI payments.  (Tr. 43.)  After Plaintiff requested review, the Appeals Council declined jurisdiction on April 5, 2006.  (Tr. 6, 9.)  Plaintiff then filed this action for judicial review under 42 U.S.C. § 405(g).

## Medical History

Plaintiff relies upon the following medical history in support of her request for judicial review.  John Savell, Ph. D. ("Dr. Savell"), a clinical psychologist, conducted a psychological evaluation of Plaintiff on August 2, 2000.  (Tr. 200-206.)  Plaintiff reported learning disabilities in reading, writing, and math.  (Tr. 200.)  She stated that she has to read something several times to understand it.  (Tr. 200-01.)  Dr. Savell administered several psychometric tests.  On the Block Design test, Plaintiff could not make any designs unless the examiner demonstrated them first.  (Tr. 201.)  "On the Digit Symbol subtest, she would look at the table at the top of the page when filling in each box."  (*Id*.)  On the WAIS-III, she had a performance IQ of 68 and a full-scale IQ of 70.  (Tr. 202.)  The WRAT-3 found spelling at the first percentile, with arithmetic and reading comprehension at the 6th percentile.  (Tr. 203-204.)  A personality profile was consistent with individuals who are reluctant to admit problems.  Her personality and behavior problems reflected low frustration tolerance and impulsivity.  Possible problems included difficulty with authority figures, perceived rejection by social groups, and social immaturity.  (Tr. 204.)  Dr. Savell stated that

Plaintiff might benefit "from some form of supported employment."  (Tr. 206.)

Bobbie Hart Lilly, Ph. D. ("Dr. Lilly"), a psychologist, interviewed Plaintiff on June 5, 2003. (Tr. 422-425.)  Dr. Lilly's examination did not include formal psychological testing.  Plaintiff was 5'3" and weighed 300 pounds.  "Her constant smile was inappropriate with the topics being discussed."  (Tr. 422.)  Plaintiff reported a history of special education due to learning disabilities. (Tr. 423.)  Dr. Lilly asked Plaintiff to draw two overlapping pentagons.  Dr. Lilly described Plaintiff's drawing as "exceptionally poor" and noted that "distortions (suggested) brain injury or severe visual-perceptual problems."  (*Id*.)  The psychologist was not surprised that Plaintiff has difficulty reading and driving a car.  Plaintiff's mother stated that Plaintiff frequently reverses the letters when she writes.  (Tr. 424.)  Dr. Lilly diagnosed borderline intellectual functioning and indicated that Plaintiff's adaptive behaviors appear to be in line with her limited intellectual functioning.  The prognosis was guarded.  Dr. Lilly concluded that "[Plaintiff] will have difficulty getting hired and keeping a job in competitive employment."  Dr. Lilly suggested that Plaintiff might do well with a job coach.  (Tr. 424.)

A State agency medical consultant ("SAMC") reviewed the evidence and determined that Plaintiff suffers from mental retardation and that this results in moderate impairment in her ability to maintain concentration, persistence, or pace.  (Tr. 380, 390, 450, 460.)  These findings were affirmed by other State agency physicians who reviewed the evidence.  (*Id*.)  Their mental RFC assessments found Plaintiff markedly limited in her ability to understand, remember and carry out detailed instructions.  (Tr. 464.)  She was moderately limited in her ability to: (1) maintain attention and concentration for extended periods; (2) complete a normal work day and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an

5

unreasonable number of and length of rest periods; and (3) to respond appropriately to changes in the work setting.  (Tr. 464-465.)

Plaintiff's longtime treating physician, J. Mike White, M.D. ("Dr. White"), diagnosed and treated Plaintiff for diabetes and obesity.  (Tr. 226-374.)  His records indicate that from 1993 through 1995, Plaintiff was maintaining a blood glucose of 213 to 237 and a hemoglobin A1c of 7.02.  (Tr. 365-67, 369-72.)  However, by October of 1998 her hemoglobin A1c had increased to 10.81 and in March 1999 it was 9.06.[2]  (Tr. 314, 318.)  Subsequent records reflect continued persistent elevation of the A1c readings.  (Tr. 296, 299-300, 306, 308, 310, 313.)  Meanwhile, Plaintiff's weight increased from 185 pounds on August 12, 1991, to 276 pounds on May 17, 1999, to 301 pounds in June 2001.  (Tr. 232, 247, 290.)  Dr. White's records indicate poor diabetic control. (*Id*.)  He also reported that Plaintiff was not compliant with her diet.  (Tr. 244, 249, 254, 263, 265-267.)  Dr. White reported that Plaintiff "is mildly retarded and struggles mightily with diet and selfcontrol."  (Tr. 248.)  On November 12, 2000, Dr. White expressed the opinion that Steagall's "mental challenges contribute heavily to her poor compliance and difficulty in managing her disease process.  It would be my opinion that she is permanently disabled."  (Tr. 238.)  On March 5, 2002, Dr. White reported that the Plaintiff "is mentally & physically challenged.  She is totally disabled & unable to work."  (Tr. 398.)  Dr. White advised on December 29, 2003, that Plaintiff "certainly is not capable of functioning in the workplace" and on February 11, 2005, he reported that she was unable to work at any level.  (Tr. 403, 485.)  With regard to the issue of compliance with her diet, Dr. White reported, "[b]less her heart she thinks she is sticking with a diet when she is not."  (Tr.

---

[2] A normal A1c reading is less than 6.5 and normal blood glucose levels are 60-110.  (Tr. 300.)

446.)  He suggested that the only intervention that could help would be for Plaintiff to consider bariatric surgery.  (*Id*.)  However, Dr. White noted that indigent health care probably would not pay for that surgery.  (*Id*.)

Dr. Gary W. Chandler, a podiatrist, treated Plaintiff for foot and nail problems.  (Tr. 426-443.)  He reported that Plaintiff had diabetic peripheral neuropathy.  (Tr. 431-432, 434-435.)  Dr. Kenneth Mair, an endocrinologist, also examined Plaintiff.  (Tr. 188-199.)  In December, 1999, he noted that her blood sugars averaged 261, despite treatment with insulin.  His impressions included diabetes, obesity, and disability.  (Tr. 190.)

At the hearing of August 28, 2002, Plaintiff testified that she has numbness of the fingers and feet and that prolonged sitting causes her hands and feet to go numb.  (Tr. 962-963.)  Her mother goes grocery shopping with her because she is unable to go to a store and pay for items.  (Tr. 972.)  Although she took some college courses in child care, her mother and teacher helped her get through them, including reading the material to her.  (Tr. 973.)  Plaintiff tried to work, but she was fired after one month for being too slow.  (Tr. 978.)

Plaintiff testified that her college courses were remedial, and she discontinued them because she would have been required to pass the TAAS test to continue.  (Tr. 998-99.)  They were really high school courses.  (*Id*.)  She couldn't pass the written part of the drivers' test.  (Tr. 1001.)  She has difficulty doing laundry, recalling that she inappropriately bleached some clothes.  (Tr. 1003.)  She tries to walk 30 minutes, a few times per week, but she gets out of breath and barely makes it home.  (Tr. 1007.)

Plaintiff's sister testified that she balances the checkbook for Plaintiff, takes her shopping, and handles her money.  (Tr. 977.)  Plaintiff's sister testified that Plaintiff doesn't understand the

consequences of failing to adhere to her diet.  (Tr. 1006.)

### The ALJ's Decision

The ALJ concluded that Plaintiff was initially disabled under the Act beginning December 23, 1992, and has never engaged in substantial gainful activity.  (Tr. 32.)   Her medically determinable "severe" impairments present at the time of the comparison point decision ("CPD") (favorable determination) were diabetes, obesity, and borderline intellectual functioning.  (*Id*.)  The ALJ concluded that Plaintiff had the following current medically determinable "severe" impairments: diabetes, obesity, chronic ingrown toe nails, chronic skin fissuring on her right foot, hypertension, borderline intellectual functioning, and a history of major depression in full remission. (Tr. 33.)  He further found that while Plaintiff had a "severe" combination of impairments, none of her impairments, either singly or in combination, had met or medically equaled the criteria of an impairment listed in 20 C.F.R. part 404, subpart P, Appendix 1 for presumptive disability.  (Tr. 33.) Additionally, he found that Plaintiff experienced medical improvement related to her ability to work and her subjective complaints of pain and limitation were not fully credible.  (Tr. 34, 38.)  The ALJ found that Plaintiff retained the RFC to perform the full range of light exertional work (as defined in the Agency's regulations),[3] compromised by being limited to jobs with a reasoning development level of 1-2 as defined in the Department of Labor's *Dictionary of Occupational Titles* ("DOT").

---

[3]  Light exertional work is defined by Social Security regulations as lifting no more than 20 pounds at a time with frequent lifting and carrying of objects weighing up to 10 pounds.  20 C.F.R. § 404.1567(b).  Even though the weight lifted may be very little, a job in this category may also require a good deal of walking, standing, or sitting as well as some pushing and pulling of arm or leg controls.  *Id*. In addition, Social Security regulations state that to be considered capable of performing a full or wide range of light work, the claimant must be able to perform substantially all of these activities.  *Id*.  If someone is capable of performing light exertional work, then he or she can perform sedentary exertional work.  *Id*.

(Tr. 40.)[4] Additionally, the ALJ found that Plaintiff can work with this RFC on a sustained, fulltime basis, as well as maintain employment for an indefinite period of time.  (Tr. 40.)  Finally, the ALJ concluded that although Plaintiff has no past relevant work, she can now perform other work existing in significant numbers in the economy such as industrial cleaner (8,000 jobs in Texas and 100,000 jobs nationally), housekeeper (motel) (8,200 jobs in Texas and 100,000 jobs nationally), and laundry bagger (3,200 jobs in Texas and 40,000 jobs nationally).  (Tr. 43.)  Consequently, the ALJ found that Plaintiff's disability ceased on July 1, 1999, and that she has not been under a disability at any time subsequent to that date.  (*Id.*)

## Whether the Commissioner Provided a Record Sufficient to Establish Whether Medical Improvement Occurred

In 20 C. F. R. § 414.994, the Commissioner tells claimants how the Commissioner will determine whether the claimant's disability continues or ends.  Medical improvement is defined in pertinent part as follows:

> Medical improvement is any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled . . . .  A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s) (*see* § 416.928).

20 C. F. R. § 416.994(b)(1)(I).

> With respect to the point of comparison, the regulation further provides in pertinent part:

> For purpose of determining whether medical improvement has occurred, we will compare the current medical severity of that impairment(s) which was present at the

---

[4]  A reasoning development level of 1 equates to, "[a]pply commonsense understanding to carry out simple one-or-two step instructions . . . [d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job."  *See DOT*, Appendix C, page 1011 (Vol. II, 1991).  A reasoning development level of 2 equates to, "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions . . . [d]eal with problems involving few concrete variables in or from standardized situations."  *Id.*

time of the most recent favorable medical decision that you were disabled . . . to the medical severity of that impairment(s) at the time.  If medical improvement has occurred, we will compare your current functional capacity to do basic work activities (i.e., your residual functional capacity) based on the previously existing impairments with your prior residual functional capacity in order to determine whether the medical improvement is related to your ability to do work.

20 C. F. R. § 416.994(b)(1)(vii).  To determine medical improvement and its relationship to a claimant's ability to do work, additional factors and considerations provide different scenarios depending upon whether an RFC assessment was made or should have been made.  If one was made, the Commissioner will compare it to the current evidence to determine if the claimant's functional capacity for basic work activities has increased.  20 C. F. R. § 416.994(b)(2)(iv)(B).  If an RFC assessment should have been but was not made, or if the RFC assessment at the time of the most recent favorable assessment is missing, the Commissioner will reconstruct the RFC.  20 C.F.R.§ 416.994(b)(2)(iv)(C).

Claimants are given specific instructions on how their determination will be handled if the prior file cannot be found:

(E) Prior file cannot be located.  If the prior file cannot be located, we will first determine whether you are able to now engage in substantial gainful activity based on all your current impairments.  (In this way, we will be able to determine that your disability continues at the earliest point without addressing the often lengthy process of reconstructing prior evidence.) If you cannot engage in substantial gainful activity currently, your benefits will continue unless one of the second group of exceptions applies (see paragraph (b)(4) of this section).  If you are able to engage in substantial gainful activity, we will determine whether an attempt should be made to reconstruct those portions of the missing file that were relevant to our most recent favorable medical decision (e.g., work history, medical evidence from treating sources and the results of consultative examinations).  This determination will consider the potential availability of old records in light of their age, whether the source of the evidence is still in operation, and whether reconstruction efforts will yield a complete record of the basis for the most recent favorable medical decision.  *If relevant parts of the prior record are not reconstructed either because it is determined not to attempt reconstruction or because such efforts fail, medical improvement cannot be found.* The documentation of your current impairments will provide a basis for any future

reviews. If the missing file is later found, it may serve as a basis for reopening any decision under this section in accordance with § 416.988.

20 C.F.R. § 416.994 (B)(2)(iv)(E) [emphasis supplied].  As noted above, medical improvement requires a comparison of the symptoms, signs and laboratory findings at the time disability was found to exist, with those at the time disability is found to have ceased.  In making the determination that medical improvement had occurred in this case, the state agency referred to the following medical evidence:

> Family Medical Associates, records of 7/16/92-8/17/92;
>
> Walls Regional Hospital 9/10/92;
>
> Dr. Karl Wedal, records of 8/91-9/92;
>
> Dr. Stan Johnson, records of 7/92-10/92;
>
> Dr. Robert Aguirre, consultative examination 3/93;
>
> Dr. Mike White, records of 2/85-5/91;
>
> Cleburne ISD records;
>
> Dr. Phillip Sheinburg, records of 1/78-7/91;
>
> Dr. James Baxter, psychological consultative exam 7/91.

(Tr. 493).  The administrative record or transcript that was provided to this Court does not contain these records.[5]  Additionally, the record does not reveal whether the Commissioner attempted to obtain or reconstruct these records.  Notably missing are both the physical and mental RFCs from the prior favorable determination.   Plaintiff was found disabled initially based upon severe impairments of diabetes, obesity, and borderline intellectual functioning.  The Commissioner's criptic explanation for termination of Plaintiff's benefits was, "[e]ven though your other conditions did not improve, your overall health did improve." (Tr. 493.)  Claimants are instructed that "the

---

[5]  The Commissioner points out that treatment records of J. Mike White, M.D., go back to at least May 1991.  (Tr. 291.)  The legible part of the brief entry for May 31, 1991 shows only that Plaintiff weighed 195 3/4 pounds and had lost five pounds.

determination that medical severity has decreased must be based on improvements in the symptoms, signs and /or laboratory findings associated with such impairments.  20 C.F.R. §§ 404.1594(b)(1), 416.1594(b)(3).  If the medical records which show the symptoms, signs and/or laboratory findings which were the basis for finding that Plaintiff was disabled are not included in the transcript, the Commissioner cannot judge whether medical improvement has occurred.

The claimant is also told that medical improvement is related  to the ability to work if it increases a claimant's "functional capacity to do basic work activities."   20 C.F.R. §§ 404.1594(b)(3),(4); 416.994(b)(3),(4).  "Basic work activities" means the abilities to do most jobs; included are exertional abilities such as walking, standing, stooping, pushing, pulling, reaching and carrying, and nonexertional capacities such as seeing, hearing, speaking, remembering, using judgment, dealing with changes and relating to supervisors and co-workers.   20 C.F.R. § 404.1594(b)(4).  Records of Plaintiff's ability to do basic work activities at the time she was found disabled are not included in the transcript.

The Court must decide whether the decision is supported by substantial evidence in the record, and whether the proper legal standards were used in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir.  1994).  If not, the Court must decide whether Plaintiff's substantial rights were affected.  Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance."  *Leggett*, 67 F.3d at 564.  The reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present.  *Greenspan*, 38 F.3d at 236.

In this case, Plaintiff seeks reversal of the Commissioner's decision and payment of benefits.

However, if the ALJ decision is not supported by substantial evidence, a remand with the instruction to make an award is only appropriate if the record enables the court to determine definitively that the claimant is entitled to benefits. *See Ferguson v. Schweiker*, 621 F.2d 243, 250 n.8 (5th Cir. 1981) (citing *Johnson v. Harris*, 612 F.2d 993, 998 (5th Cir. 1980) (per curiam)). Without the missing records, the Court cannot determine definitively that Plaintiff is entitled to continuing benefits. Neither can the Court determine whether the Commissioner met his burden of proof to show medical improvement related to a claimant's ability to work. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002); *Griego v. Sullivan*, 940 F.2d 942, 943-44 (5th Cir. 1991). The burden of proof is on the Commissioner to show medical and functional improvement. *Id.* The record contained only a summary of the "signs, symptoms, and laboratory findings" at the time of the CPD. (Tr. 516.) None of the psychological evidence, almost none of the medical evidence, and no mental or physical RFC assessments that were the basis for initially granting Plaintiff disability benefits beginning December 23, 1992 are included in the record. *See* 20 C.F.R. §§ 404.1594(c)(1) and 416.994(c)(1). For example, there are no comparison point records regarding Plaintiff's diabetes. Dr. White's records show that in 1993 through 1995, Plaintiff was maintaining a blood glucose of 213 to 237 (Tr. 365-67) and a hemoglobin A1c of 7.02. (Tr. 365.) In October 1998, her hemoglobin A1c had increased to 10.81 (Tr. 318) and in March 1999, it was 9.06. (Tr. 314.) A normal A1c reading is less than 6.5. (Tr. 300). Later records show continued persistent elevation of Plaintiff's A1c readings. (Tr. 296, 299-300, 306, 308, 310, 313.) Similarly, no prior records reflect Plaintiff's weight or the effects of Plaintiff's obesity for purposes of comparison. The records after the CPD show that Plaintiff's weight increased from 185 pounds on August 12, 1999, to 276 pounds on May 17, 1999, and to 301 pounds in June, 2001. Dr. White's records after the CPD indicate poor diabetic

13

control and that Plaintiff's "mental challenges contribute heavily to her poor compliance and difficulty in managing her disease process." (Tr. 238.)

Without the underlying records for comparison, the Commissioner's determination of medical improvement related to Plaintiff's ability to work does not comply with the regulations and is not supported by substantial evidence. The Commissioner does not meet his burden by concluding that Plaintiff's overall health improved while her impairments became worse. Plaintiff did not receive the process that she was due. For example, the summary states that at the time of the latest favorable decision Plaintiff suffered "weakness and fatigue from DM and obesity which limits exertional activities such as standing, lifting, and carrying heavy objects." (Tr. 516.) The ALJ's present determination was that Plaintiff had improved to the point where she could stand six hours out of an eight hour day. (Tr. 40.) Without the underlying medical records from which this summary was taken, the ALJ had nothing with which to compare Plaintiff's later medical records. The Commissioner's failure to follow its own regulations in connection with the prior medical records and prior RFC determinations and the ALJ's failure to fully develop the record affected Plaintiff's substantial rights. Substantial evidence does not support the Commissioner's decision that Plaintiff's disability ceased because the record is incomplete. The case should be reversed and remanded for further proceedings in connection with Plaintiff's Title II benefits.

The Commissioner's disability determination also included a determination that Plaintiff is not entitled to SSI benefits under Title XVI. Therefore, the Court will consider the remainder of Plaintiff's allegations that the Commissioner's decision to deny Plaintiff SSI is not supported by substantial evidence and that the proper legal standards were not applied.

**Standard of Review**

14

To be entitled to social security benefits, a petitioner must prove that she is disabled for purposes of the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled.  Those steps are:

1.      An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.      An individual who does not have a "severe impairment" will not be found to be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing her past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove her disability.

*Leggett*, 67 F.3d at 564.  The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id.*  Once the claimant satisfies her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  The Commissioner's determination is afforded great deference.  *Leggett*, 67 F.3d at 564.

### Whether the Commissioner Properly Evaluated the Medical "Listings" for Presumptive Disability

Plaintiff contends that substantial evidence does not support the ALJ's finding that Plaintiff's impairments do not meet the § 12.05(C) Listing of Impairments.  (P.'s Br. at 7-10.)  Listing 12.05(C) has two elements.  First, the claimant must have "[a] valid verbal, performance, or full scale IQ of 60 through 70," which manifested itself prior to age 22.  20 C.F.R. Pt. 404, Subpt. P, App. 1, Section 12.05C.  Second, the claimant must have a "physical or other mental impairment imposing an additional and significant work-related limitation of function."  (*Id.*)

Plaintiff argues that she meets the first prong of this listing based on Dr. Savell's IQ test on August 2, 2002. Plaintiff was twenty-nine years old when Dr. Savell's testing yielded a verbal IQ of 76 with a reliability index of 72-82; a performance IQ of 68 with a reliability index of 63-77; and a full scale IQ of 70 with a reliability index of 67-75.  (Tr. 202.)  However, according to a summary of Plaintiff's impairments, Plaintiff was given a WAIS-R on July 16, 1991, when she was 18 years old.

16

(Tr. 516.)   If the summary is correct and the test is valid, Plaintiff scored a verbal IQ of 79; a performance IQ of 71; and a full scale IQ of 74 before she was 22 years old.   The ALJ erred by determining that Plaintiff did not meet the requirements of § 12.05(C) based upon Dr. Savell's testing of Plaintiff's IQ test at age 29.   The Court is unable to determine if Plaintiff was prejudiced by this error.   If the summary was correct and the earlier IQ testing was valid, the IQ test before age 22 shows a higher IQ than the one the ALJ considered, and Plaintiff did not suffer prejudice. However, the lacunae in the record prevent this Court from determining whether the error was prejudicial.   The underlying psychological records from age eighteen, i.e., the actual records from the initial disability determination, are required.   On remand, the Commissioner should consider whether Plaintiff meets listing 12.05(C) based upon her IQ and any deficits in adaptive functioning before she reached the age of 22 years, and whether she suffers additional medical impairments which significantly limit her ability to work.

### Whether the Commissioner Properly Evaluated the Opinion of the Treating Physician

The ALJ is required to give controlling weight to a treating physician's opinion if the ALJ finds that opinion to be well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record.   *See* 20 C.F.R. § 404.1527(d)(2).   In many cases, a treating physician's opinion is entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.   *See* SSR 96-2p.   A treating physician's opinion, however, may be disregarded when good cause is shown.   *Paul v. Shalala,* 29 F.3d 208, 211 (5th Cir. 1995); *Leggett,* 67 F.3d at 566.   If good cause exists, then the ALJ may accord the treating physician's opinion less weight, little weight, or even no weight.   *Paul,* 29 F.3d at 211; *Leggett,* 67 F.3d at 566.   "The ALJ is free to reject the opinion of any physician

17

when the evidence supports a contrary conclusion." *Martinez v. Chater,* 64 F.3d 172, 176 (5th Cir.

1995) (citation omitted).

Dr. White was Plaintiff's treating physician for her diabetes and obesity from February 1985

through the date of the ALJ's decision.  The ALJ declined to give controlling or great weight to Dr.

White's opinions because "they are inconsistent with the evidence, including his own treatment

notes and the treating notes of the other treating and examining physicians." (Tr. 40.)  Although the

ALJ gives citations to the record frequently in his decision, this conclusory statement is not

supported with any citations to the record.

If the ALJ does not accord a treating physician's opinion controlling weight, the ALJ must

set forth specific reasons for the weight given, supported by the evidence in the case record.  *See* 20

C.F.R. § 404.1527(d)(2).  If a record contains no reliable medical evidence from a treating or

examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion

of the treating physician only if the ALJ performs a detailed analysis of the treating physician's

views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2).[6] *Newton v. Apfel*, 209 F.3d 448, 456

(5th Cir. 2000).  The reasons must be sufficiently specific to make clear to any subsequent reviewers

the weight the adjudicator gave to the treating source's medical opinion and the reasons for that

---

[6] Once the ALJ declines to give a treating physician's opinion controlling weight, the
ALJ must consider the following factors when deciding what weight to assign the treating
physician's opinion: (1) the physician's length of treatment; (2) the physician's frequency of
examination; (3) the nature and extent of the treatment of the relationship; (4) the support of the
physician's opinion afforded by the medical evidence of the record; (5) the consistency of the
opinion with the record as a whole; and (6) the specialization of the treating physician. 20 C.F.R.
§ 404.1527(d).  The plain language of the Social Security Regulations requires the ALJ to
consider each of these factors when deciding what weight to assign a treating physician's
opinion.

weight.  The ALJ must explain the weighing in the decision, and the weight will stand or fall on the reasons set forth in the opinion.  *Newton*, 209 F.3d at 455.

The ALJ correctly noted that "whether a claimant is 'disabled' or 'unable to work'" is not a medical opinion but rather is an issue "reserved to the Commissioner." (*Id.*, citing 20 C.F.R. § 404.1527(e)).  The ALJ excused himself from further analysis of Dr. White's opinions by stating that opinions on issues reserved to the Commissioner do not require analysis under the specific factors of 20 C.F.R. § 404.1527(d).  (*Id.*, citing *Frank v. Barnhart*, 326 F.3d 618 (5th Cir. 2003). However, Dr. White's longterm treatment records of Plaintiff's diabetes and obesity contain much more than just an opinion that Plaintiff is disabled or unable to work.  Therefore, the analysis was required.       Although some courts have found that the ALJ does not have to reference each factor listed in 20 C.F.R. § 404.1527(d), the Court finds that in this case, when the ALJ did not give controlling or even great weight to Dr. White's treatment of Plaintiff, the ALJ had an obligation to discuss each factor.  The ALJ erred because, contrary to the mandate of the Social Security Regulations instructing the ALJ to consider each of these factors, the ALJ's decision did not demonstrate that he had considered each factor listed in 20 C.F.R. § 404.1527(d) when deciding what weight to assign to Dr. White's opinions.  In fact he never stated what weight he assigned to Dr. White's opinions.  Plaintiff was prejudiced because although the ALJ stated that Dr. White's opinions were not consistent with those of other physicians, the ALJ did not explain why he reached this conclusion or what evidence from a treating or examining physician contradicted Dr. White's opinions.

Moreover, if the ALJ determines that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, absent other medical opinion evidence based on

personal examination or treatment of the claimant, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. Section 404.1512(e). Dr. White's records indicate that Plaintiff's diabetes is in poor control. He changed her medications many times in an attempt to control her diseases and referred her to an endocrinologist. (Tr. 692.) Dr. White explained throughout his treatment records that Plaintiff's mental challenges contribute heavily to her poor compliance and difficulty in managing her disease process and that Plaintiff's reduced IQ contributes to her difficulty in managing her condition. (Tr. 238.) The ALJ dismissed these medical opinions, stating: "Dr. White cited mental retardation as one of Ms. Steagall's impairments; however, as discussed above, the evidence and psychiatric and psychological examinations have been more consistent with Ms. Steagall's having borderline intellectual functioning." It is apparent from the record that Dr. White did not purport to know the distinction in Social Security terms between "mental retardation" and "borderline mental functioning" and that his opinions about Plaintiff's ability to understand and carry out his instructions were based upon his long-time treatment of Plaintiff, not on psychological testing. Moreover, Dr. White's assessments of Plaintiff's mental abilities were consistent with those of the agency consultants Dr. Lilly and Dr. Savell, both of whom found that Plaintiff could only be employed in supported employment, with special supervision or a job coach. (Tr. 206, 424.)

Dr. White's numerous laboratory tests and medical records reflect that Plaintiff's blood sugar remained out of control a majority of the time, that her diabetes is insulin resistant, and that Plaintiff's diabetes did not respond well to a number of the drugs that Dr. White prescribed. Dr. White stated that Plaintiff's mental condition, diabetes, and obesity prevented her from working, but he did not fully explain the effect Plaintiff's condition had on her ability to work. For example,

20

Dr. Holm, a consultative examiner, indicated that Plaintiff's energy is chronically low.  (Tr. 651.)

Dr. Holm also stated that Plaintiff's ability to cook dinner occasionally (once about every two

weeks), shop, and perform chores is limited, secondary to her difficulty getting around because of

her weight.  In *Ripley v. Chater*, 67 F.3d 552, 557-558 (5th Cir. 1995), the Fifth Circuit Court of

Appeals found that the record did not clearly establish the effect the claimant's condition had on his

ability to work.  (*Id.*)  In that case, the only evidence regarding the claimant's ability to work came

from the claimant's own testimony.  (*Id.*)  The appellate court remanded the case and instructed the

ALJ on remand to obtain a report from a treating physician regarding the effects of the claimant's

condition upon his ability to work.[7]  (*Id.*)  In this case, the ALJ should have recontacted Dr. White

about the specific effects Plaintiff's severe impairments had on her ability to function.[8]

Before the CPD, Plaintiff had weakness and fatigue from diabetes and obesity which limited

exertional activities such as standing, lifting, and carrying heavy objects, (Tr. 516.)  The ALJ

determined that effective July 1, 1999, Plaintiff could stand six hours in an eight hour day.  (Tr. 40.)

The record does not reflect how or when Plaintiff recovered from these exertional limitations,

particularly in light of Dr. White's medical records which indicate that Plaintiff's diabetes and

---

[7]  In *Ripley*, the Commissioner argued that the medical evidence substantially supported the ALJ's conclusion. In making this argument, the Commissioner pointed to reports discussing the extent of Ripley's injuries. The reviewing court held that "without reports from qualified medical experts, however, we cannot agree that the evidence substantially supports the conclusion that Ripley was not disabled because we are unable to determine the effects of Ripley's conditions, no matter how "small", on his ability to perform sedentary work."  *Ripley*, 67 F.3d at 557-558 n 27.

[8]  *See* 20 C.F.R. § 404.1527(c)(3) (1994) (requiring the recontacting of the treating physicians to obtain additional information regarding an applicant's ability to work when the record is insufficient to make a determination of whether an applicant is disabled).

obesity became worse rather than better.[9]

The Court recommends that the District Court reverse and remand this case with instructions to the ALJ to recontact Dr. White about the effect of Plaintiff's diabetes and obesity upon her various functional abilities.  On remand, the ALJ should consider and specifically discuss *each* factor outlined in 20 C.F.R. § 404.1527(d) when explaining the weight he gives to Dr. White's opinions.  The ALJ should explain the impact each 20 C.F.R. § 404.1527(d) factor had on his decision of what weight to assign to Dr. White's opinions.  The ALJ should not limit his discussion to the factors that support his decision but should address each factor.  In addition, conclusory or brief references to the 20 C.F.R. § 404.1527(d) factors will not suffice.  The ALJ needs to examine the record and consider and reference the evidence available for each factor and whether that factor supports or detracts from the ALJ's conclusion of what weight to assign Dr. White's opinions.

## Whether the Commissioner Properly Considered the Vocational
## Significance of All of Plaintiff's Nonexertional Impairments

Plaintiff contends that the ALJ failed to consider all of the limitations assessed by the SAMCs, as well as the functional limitations assessed by the consultative psychological examiner,

---

[9]  Dr. White's records show that in 1993 through 1995, Plaintiff was maintaining a blood glucose of 213 to 237 (Tr. 365-67) and a hemoglobin A1c of 7.02.  (Tr. 365.)  In October 1998, her hemoglobin A1c had increased to 10.81 (Tr. 318) and in March 1999, it was 9.06.  (Tr. 314.)  A normal A1c reading is less than 6.5.  (Tr. 300).  Later records show continued persistent elevation of Plaintiff's A1c readings.  (Tr. 296, 299-300, 306, 308, 310, 313.)  Similarly, Dr. White's records show that Plaintiff's weight increased from 185 pounds on August 12, 19991 to 276 pounds on May 17, 1999, and to 301 pounds in June, 2001.  At the time of the hearing before the ALJ, Plaintiff weighed 318 pounds.  (Tr. 1008.)  According to the medical summary, Plaintiff's fatigue and weakness resulted from her diabetes and obesity.  The record contains no medical opinion explaining how Plaintiff's fatigue and weakness from diabetes and obesity could improve when the laboratory findings and medical reports show that Plaintiff's diabetes and obesity became worse.

Dr. Savell.  (Pl.'s Br. at 14-17.)  The Commissioner responds that the ALJ considered the functional limitations found by the SAMCs and discounted Dr. Savell's consultative examination report for legally sufficient reasons.  (Def.'s Br. at 20.  The Court agrees with Plaintiff that the ALJ failed to consider the vocational significance of all of her nonexertional impairments.  The ALJ must consider the entire record and cannot "pick and choose" only the evidence that supports his position.  *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).  "The [proper] inquiry [] is whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached by the ALJ."  *Id*.

Dr. Savell's psychological testing indicated significant functional limitations. (Tr. 200.) Dr. Savell noted learning disabilities in reading, writing, and math. (Tr. 203-204.) Plaintiff's scores on the  on the WRAT-3 support his conclusions.  His personality testing of Plaintiff showed  a profile of an individual prone to interpersonal problems and to conflict with authority figures.  (Tr. 205.) Dr. Lilly noted visual-perceptual problems and distortions suggestive of a brain injury.  (Tr. 424.) The State agency physicians ("SAMC") also reported moderate impairments in Plaintiff's ability to maintain attention and concentration for extended periods; complete a normal work day and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and to respond appropriately to changes in the work setting.  (Tr. 464-465.)

The ALJ credited Dr. Savell's Global Assessment of Functioning  ("GAF") of 65.[10] However, the ALJ discredited Dr. Savell's finding that Plaintiff had mild mental retardation.  (Tr.

---

[10]  GAF is a standard measurement of an individual's overall functioning level "with respect only to psychological, social, and occupational functioning." <u>Diagnostic and Statistical Manual of Mental Disorders</u> (Fourth Ed. 2000) ("DSM-IV-TR") at 32.

33.)  The ALJ discredited Dr. Lilly's GAF assessment of 50, as well her findings that (1) Plaintiff's adaptive behaviors appear to be in line with her limited intellectual functioning; (2) Plaintiff's prognosis was guarded; and (3) "[Plaintiff] will have difficulty getting hired and keeping a job in competitive employment."   However, even though Dr. Lilly did not administer full-scale IQ tests, the ALJ credited Dr. Lilly's findings that: (1) Plaintiff scored 29 out of 30 points on a mini-mental state evaluation; (2) her memory and concentration are intact; and (3) she was able to complete a number of simple commands.  (*Id*.)   In other words, the ALJ merely selected the parts of the psychological evidence and mental RFC determinations that supported a finding of non-disability.

The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, co-workers, and usual work situations; and to deal with changes in a routine work setting.  *See* Social Security Rulings ("SSR") 85-15, 96-8p, and 96-9p.  "A substantial loss of ability to meet any of these basic work related activities would severely limit the potential occupational base.  This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base" SSR 85-15; *also see* SSR 96-9p.  Even when the loss of ability is less than "substantial," the occupational base may still be significantly eroded. "The individual's remaining capacities must be assessed and a judgment made as to their effects on the unskilled occupational base considering the other vocational factors of age, education, and work experience.  SSR 96-9p.

For a VE's testimony to be valid, the ALJ must advise the VE of all the claimant's exertional and nonexertional limitations.  Particular exertional or nonexertional impairments may have little or substantial effect on the range of work remaining that an individual is able to perform.  A

vocational specialist can assess the effect of any limitation on the range of work at issue and advise the ALJ whether the impaired person's RFC permits her to perform substantial numbers of occupations within the range of work in the region of the country in which the person lives or in the several regions of the country.  SSR 83-14, 83-12.

After reviewing the medical records, the SAMCs found  marked impairments in Plaintiff's capacity (1) to understand and remember detailed instructions and (2) to carry out detailed instructions.  They found moderate impairments in Plaintiff's abilities (1) to understand and remember very short and simple instructions, (2) to maintain attention and concentration for extended periods, (3) to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, (4) to respond appropriately to changes in the work setting, (5) to travel in unfamiliar places or use public transportation, and (6) to set realistic goals or make plans independently of others.

Although the ALJ's decision stated he agreed with the SAMCs, the ALJ's hypothetical to the VE limited the hypothetical person to jobs at the reasoning level of one or two. This would only go to the claimant's memory and concentration capabilities.  *See Boyd v. Apfel*, 239 F.3d 698, 797 (5th Cir. 2001).  The hypothetical did not include any of the other significant nonexertional limitations.

Plaintiff was fired from one-job because she did not follow the employer's safety rule to put out enough wet floor warning signs when she mopped (inability to understand very short and simple instructions) and fired from another job after one month because she could not complete her work in a timely manner (ability to perform at a consistent pace).  (Tr. 985.)  On cross-examination, the

VE stated that if an individual could not maintain persistence and pace sufficient enough to complete job tasks in an eight hour workday, the individual would not be able to perform the jobs previously listed as being available to a person with the RFC outlined by the ALJ.  (Tr. 1013.)  Substantial evidence does not support the ALJ's decision that Plaintiff can perform the jobs described by the VE because the ALJ failed to include all of Plaintiff's nonexertional limitations in the hypothetical to the VE.  *See Boyd*, 239 F.3d at 707.  Plaintiff was prejudiced because if all of the limitations had been included, the VE's testimony might have been different and the ALJ might have reached a different decision.

### Whether the ALJ Failed to Properly Evaluate Plaintiff's Credibility

Plaintiff contends that the ALJ failed to properly evaluate Plaintiff's credibility.  (Pl.'s Br. at 17-19.)  The Commissioner counters that the ALJ properly discussed relevant factors that he used to conclude that Plaintiff was not fully credible.  (Def.'s Br. at 22-24.)  An ALJ's evaluation of the credibility of subjective complaints is entitled to judicial deference if it is supported by substantial evidence.  *See Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990).  Nonetheless, "an ALJ's unfavorable credibility evaluation of a claimant's complaints of pain will not be upheld on judicial review where the uncontroverted medical evidence shows a basis for the claimant's complaints unless the ALJ weighs the objective medical evidence and assigns articulated reasons for discrediting the claimant's subjective complaints of pain." *Abshire v. Bowen*, 848 F.2d 638, 642 (5th Cir. 1988).

The ALJ found that Plaintiff was not entirely credible because of her "persistent, chronic noncompliance" with her doctors' instructions regarding diet, exercise, and management of her diabetes and obesity.  (Tr. 38-39, 40.)  When an ALJ determines whether the claimant has an

acceptable reason for failing to follow the prescribed treatment, the ALJ must consider the claimant's limitations, including mental limitations. 20 C.F.R. § 404.1530(c). Courts have found that non-compliance that is the result of a mental impairment rather than the claimant's rational choice or neglect may be a justifiable excuse, and that each case depends upon its individual facts, rather than a *per se* rule. *See Lovelace v. Bowen*, 813 F.2d 55, 59-60 (5th Cir. 1987); *Scott v. Heckler*, 770 F.2d 482, 486-87 (5th Cir. 1985); *Brashears v. Apfel*, 73 F. Supp. 648, 651 (W.D. La. 1999). Plaintiff's treating physician found that Plaintiff's decreased intelligence and mental challenges contributed to her poor compliance and difficulty managing her diabetes. (Tr. 233, 248, 403, 692.) An ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion. *Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004), quoting *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (quotation and emphasis omitted). *See Sharp v. Bowen*, 705 F. Supp. 1111, 1124 (W.D. Pa. 1989) (noting that an individual with a severe mental impairment quite likely lacks the capacity to be "reasonable" and may not have the same capacity to assess the risks and benefits of following the doctor's orders). In this case the ALJ did not point to contradictory evidence showing that Plaintiff's "noncompliance" was a result of personal choice. Rather, the ALJ stated that he had considered Plaintiff's borderline intellectual functioning in connection with her credibility and noncompliance and although he found "her credibility diminished to a lesser degree than would ordinarily be the case with such persistent noncompliance." Nonetheless, the ALJ found Plaintiff "not entirely credible."

The ALJ rejected Dr. White's diagnosis of mental limitations as the basis for Plaintiff's

noncompliance based upon Plaintiff's "mental capacity to perform a variety of household chores." (Tr. 39.)  "Ms. Steagall [] reported she cooked, cleaned, vacuumed, did laundry, washed dishes, shopped and completed other household chores." (Tr. 38.)  The ALJ failed to mention the following evidence:  Plaintiff performs household chores with special assistance and supervision from her mother and even then, she still may perform the chore incorrectly.  (Tr. 972, 977, 1001, 1003-1004.). Plaintiff's mother needs to keep her on track because she gets distracted.  (Tr. 979.)  Plaintiff may vacuum a little and rest and then vacuum a little more and rest.  (Tr. 980.)  Her mother grocery shops with her.  (Tr. 1003.)  Plaintiff is not able to go into a store and buy something and pay for it.  (Tr. 972.)  She cannot manage her money by herself.  (Tr. 1004.)  Plaintiff does not drive because she has not been able to pass the test for a driver's license.  (Tr. 1001.)  Substantial evidence does not support the ALJ's conclusion that Plaintiff's mental limitations do not excuse her noncompliance. This is true because the ALJ failed to take into account any limitations on Plaintiff's performance of household chores.  Plaintiff was prejudiced because the ALJ's determination of her credibility was an important factor in determining that Plaintiff was not disabled.

Plaintiff argues that the ALJ's credibility determination was flawed because he failed to evaluate the credibility of Plaintiff's sister's testimony.  Plaintiff's sister testified that she and her family talk to Plaintiff about her weight all the time and that Plaintiff just does realize the effects or doesn't understand it, and her conditions are becoming worse.  (Tr. 1006).  In evaluating the intensity and persistence of a claimant's symptoms, the Commissioner will "consider all of the available evidence, including . . . statements from . . . other persons about how your symptoms affect you." 20 C.F.R. § 1529(c).  *See also* S.S.R. 96-7p.  In this case, the ALJ entirely failed to assess the hearing testimony of Plaintiff's sister.  The Court finds that the ALJ erred and Plaintiff was

28

prejudiced because the sister's testimony supports Dr. White's assessment that Plaintiff's noncompliance resulted from her lack of understanding of her conditions.

The Court notes *sua sponte* that the ALJ's credibility determination was flawed because the ALJ did not apply the special considerations with respect to noncompliance when obesity is a severe impairment.  Social Security regulations recognize that "obesity is a complex, chronic disease" and that "[t]reatment for obesity is often unsuccessful." SSR 02-1P, 2000 WL 628049 *2 (Sept. 12, 2002).  Obesity is also a "risk factor that increases an individual's chances of developing impairments in most body systems"; "commonly leads to, and often complicates, chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems"; and "may cause or contribute to mental impairments" and certain sleep disorders. *Id.,* at *3. *See also id.,* at *6 (obesity "can lead to drowsiness and lack of mental clarity during the day").  Until August 24, 1999, obesity was a listed impairment under step three of the sequential analysis and may still, by itself, "medically equal" a listing, thereby resulting in an automatic finding of disability. *See id.,* at **1, 5.

The ALJ discounted Plaintiff's credibility because, in his estimation, Plaintiff had been persistently, chronically noncompliant with her doctors' advice to lose weight.  The Commissioner "will rarely use 'failure to follow prescribed treatment' for obesity to deny ... benefits."  *See id.,* at *9.  To deny benefits on such grounds, all of the following conditions must be met:

> • The individual has an impairment(s) that meets the definition of disability, including the duration requirement, and
> • A treating source has prescribed treatment that is clearly expected to restore the ability to engage in substantial gainful activity, and
> • The evidence shows that the individual has failed to follow prescribed treatment without a good reason.

*Id.,* at *9. When the ALJ discounted Plaintiff's credibility based upon noncompliance, the  ALJ did

not even mention Plaintiff's obesity, much less consider whether any of these conditions were

satisfied.  Pursuant to SSR 02-01p, treatment for obesity "must be *prescribed* by a treating source,

... not simply *recommended.*" *Id.* (emphasis added).  "A treating source's statement that an

individual 'should' lose weight or has 'been advised' to get more exercise," the ruling continues,

"is not prescribed treatment." *Id.*  Here the ALJ sidestepped the issue of denying benefits for

noncompliance with treatment for obesity by using Plaintiff's failure to lose weight as a key factor

in his credibility determination.  In turn, he used it to discredit Plaintiff's allegations regarding her

limitations and pain and ultimately found that Plaintiff was not disabled.[11]  Substantial evidence does

not support the ALJ's credibility determination.  Plaintiff was prejudiced because if the ALJ had

considered Plaintiff's noncompliance according to the obesity standards, he may well have found

Plaintiff to be entirely credible.  In sum, the ALJ's decision that Plaintiff is not credible because (1)

she is noncompliant with her diet and (2) reports that she performs household tasks is not supported

---

[11]  In cases pre-dating the deletion of Listing 9.09 (Obesity), courts consistently
recognized that "'losing weight is a task which is not equivalent to taking pills or following a
prescription.'" *Reed v. Sullivan,* 988 F.2d 812, 817 (8th Cir. 1993) (quoting *Hammock v. Bowen,*
879 F.2d 498, 503-04 (9th Cir. 1989), in turn relying on *Lovelace,* 813 F.2d at 59 (Fifth Circuit
faulted Commissioner for finding obesity to be *per se* remediable), and *Johnson v. Sec'y of
H.H.S.,* 794 F.2d 1106, 1112-13 (6th Cir. 1986) (claimant's failure to lose weight does not
necessarily constitute refusal to undertake treatment)).  Courts have found that these cases
continue to be applicable despite the deletion of obesity as a stand-alone listing.  *See e.g., Barrett
v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004) (recognizing that "the ALJ may have been
hinting that Barrett should lose weight, that obesity is like refusing to wear glasses or a hearing
aid–essentially a self-inflicted disability that does not entitle one to benefits or boost one's
entitlement by aggravating another medical condition").  *See also*, 20 C.F.R. §§ 404.1530(a), (b);
*Shramek v. Apfel,* 226 F.3d 809, 812 (7th Cir. 2000); *Wilder v. Chater,* 64 F.3d 335, 336 (7th
Cir. 1995); *Johnson v. Apfel,* 240 F.3d 1145, 1148 (8th Cir. 2001).  The SSA ruling makes it
clear that the effect obesity has on a claimant in combination with other impairments continues
to be an important consideration during the sequential evaluation process.   Nothing about the
deletion of obesity as a separate listing negates the difficulties faced by an obese person in losing
weight and otherwise functioning in spite of the person's weight.

by substantial evidence and has resulted in prejudicial error.

## Conclusion

The incomplete record requires reversal and remand of the Commissioner's decision that Plaintiff's adult Child Insurance Benefits be terminated.  Further, the Commissioner's decision denying Plaintiff's SSI application is not supported by substantial evidence and results from prejudicial legal error.  Therefore, the Commissioner's decision denying SSI benefits should be reversed and remanded for additional proceedings.

## RECOMMENDATION

The Court finds that decision of the Commissioner is not supported by substantial evidence and recommends that it be vacated.  The case should be reversed and remanded for supplementation of the record and for further consideration in accordance with these findings and conclusions.

Signed, July 5, 2007.


_____

PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a true copy of these findings, conclusions and recommendation on the parties.  Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must serve and file written objections within ten days after being served with a copy.  A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made.  The District Court need not consider frivolous, conclusory or general objections.  A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court.  *See Thomas v. Arn*, 474 U.S. 140, 150 (1985).  Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error.  *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).